FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2018 AUG 27 AM 10: 47

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 76069-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| BRIANNA D. BOWDEN, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 27, 2018 |

TRICKEY, J. — A jury convicted Brianna Bowden of first degree theft and four counts of Medicaid false statement. Bowden appeals, claiming that the State failed to prove that she improperly obtained more than $5,000 in property as required for conviction on first degree theft. She also argues that the prosecutor committed misconduct by misstating the law during closing arguments and that her multiple Medicaid false statement convictions violate the double jeopardy clauses of the Washington State and United States Constitutions. Finding no error, we affirm.

## FACTS

Erica Selikoff Thompson had multiple health problems that required a full-time caregiver.[1] The Community Options Program Entry System (COPES) approved her for 113 hours per month of Medicaid funded in-home care. Bowden became Erica's caregiver in April 2011.

---

[1] When Bowden worked for her, Erica was married to Steven Selikoff. Steven and Erica subsequently divorced and Erica became Erica Thompson after remarrying. To reduce confusion, this opinion will refer to Ms. Thompson as Erica. No disrespect is intended.

became Erica's caregiver in April 2011.

Bowden went to Erica's house to provide physical and emotional support. She helped Erica with all aspects of daily life. Erica needed constant care, requiring a caregiver in close, physical proximity. Erica described Bowden as "a very good caregiver."[2]

Bowden generally worked 11 hours per day for five days each week. Erica and her husband Steven Selikoff paid out of pocket for any hours in excess of the approved monthly 113 hours. As Erica's representative payee with power of attorney, Selikoff handled the financial matters, which included verifying Bowden's hours. Bowden kept a record of her hours worked and reconciled them with Selikoff.

As an approved care provider contracting with the State, Bowden received a monthly invoice from the Washington Department of Social and Health Services. In order to receive payment, Bowden was required to submit her hours using a telephonic invoice system. These submissions were invoices for payment and resulted in a check or electronic transfer of funds from the State.

On November 5, 2014, at approximately 2:00 p.m., Erica informed Bowden and Selikoff that she was moving to California with Matthew Thompson. Erica and Thompson met online and corresponded for more than a year. Together, they planned for Erica to leave Selikoff and move to California.

In light of Erica's fragile health, Thompson had flown to Seattle to accompany her to California. Selikoff and Bowden strenuously objected to this

---

[2] Report of Proceedings (RP) (Oct. 17, 2016) at 127.

plan. But Erica eventually prevailed and left for California with Thompson on November 6, 2014. Erica lived with Thompson. Thompson became Erica's caregiver, and they eventually married.

Erica received no further care from Bowden after she announced her move on November 5. Erica estimated that Bowden had provided 30 hours of care in November before the surprise departure to California.

Erica returned to Washington only once, in order to obtain a divorce from Selikoff and to pack her belongings. She also believed that her social security disability benefits would be reviewed in Washington at that time. Instead, she learned that Selikoff had scheduled her for an assessment to renew her COPES funded care in Washington, despite her relocation to California. Erica became concerned about this attempt to secure unnecessary care and spoke with her therapist about these concerns. The therapist assisted Erica with contacting the State to report the potential fraud.

The subsequent fraud investigation revealed that Bowden had submitted telephonic invoices claiming that she had provided Erica with 113 hours of care each month from November 2014 through March 2015. As a result, the State charged Bowden with one count of first degree theft and five counts of Medicaid false statement. The jury acquitted Bowden of Medicaid false statement for the count pertaining to November 2014, but convicted her on all other counts.

Bowden appeals.

## ANALYSIS

### Sufficiency of the Evidence

Bowden argues that the State failed to prove beyond a reasonable doubt that she wrongfully obtained more than $5,000 in property, as required for conviction of first degree theft. We disagree.

Due process requires that the State prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must "view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt." State v. Homan, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Salinas, 119 Wn.2d at 201. Additionally, an appellate court "must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." Homan, 181 Wn.2d at 106.

For a charge of theft, the State must prove that the defendant "wrongfully obtain[ed] or exert[ed] unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services" or "[b]y color or aid of deception . . . obtain[ed] control over the property or services of another or the value thereof, with intent to deprive him or her of such

4

property or services." RCW 9A.56.020(1)(a),(b). Theft by color or aid of deception, "criminalizes deceptive practices compelling people to part with their property when they otherwise would not. The magnitude of the crime is based, as with every other theft, on the value of the property a victim loses." State v. George, 161 Wn.2d 203, 213, 164 P.3d 506 (2007). Theft in the first degree occurs when the value of the wrongfully obtained property or services exceeds $5,000. RCW 9A.56.030(1)(a).

During closing arguments, the State clearly outlined two different methods the jury could utilize to calculate the value of the wrongfully obtained property in this case. In the first set of calculations, the State advocated that the jury should derive the amount of the theft from Bowden's gross pay. The State presented stipulated evidence that Bowden received $1,287.07 in gross pay for hours worked each month in December 2014, and January through March 2015.[3] She also earned paid vacation through March 2015. This gross income totaled over $5,300.00, clearly in excess of the threshold for first degree theft.

The State presented a second method of calculating the value of the theft using only Bowden's net pay.[4] Bowden received $1,142.42 each month in January, February, and March 2015 amounting to $3,427.26. In April 2015, Bowden received a check for $1,304.89, and her final check for $35.61 arrived in May 2015. Therefore, Bowden earned $4,767.76 in net pay for her claimed hours beginning December 2014.

---

[3] These payments were received for services billed the previous month.
[4] RP (Oct. 19, 2016) at 375.

Bowden correctly notes that the income from December to April did not exceed $5,000 as required for first degree theft. But the State also urged the jury to consider any falsely obtained income for Bowden's reported hours in November 2014. Erica testified that Bowden only worked approximately 30 hours that month, concluding her therapeutic services around 2:00 p.m. on November 5. According to calculations presented to the jury, the 30 hours Bowden actually worked were slightly less than 30 percent of the 113 hours reported for November. This meant that roughly 70 percent of Bowden's $1,142.42 check, or approximately $700, comprised pay for fraudulently reported hours. As a result, Bowden's net pay for fraudulent hours from November 2014 through March 2015 exceeded $5,000 and amounted to first degree theft.

As the trier of fact, the jury was tasked with determining whether the State proved that Bowden's theft reached the threshold for first degree theft. Viewing this evidence in the light most favorable to the State, the State provided two clear methods for calculating the value of the wrongfully obtained property that allowed the jury to determine that Bowden committed theft in excess of $5,000. Therefore, we conclude that the State provided sufficient evidence to prove first degree theft beyond a reasonable doubt.

## Prosecutorial Misconduct

Bowden claims that the prosecutor committed misconduct by misstating the law on the definition of knowledge needed to prove Medicaid false statement. Regardless of whether the prosecutor's definition of the law was improper, we

conclude that the statements taken in context do not result in prejudice requiring reversal.

To prove Medicaid false statement, the State must demonstrate that the defendant "knowingly" made a false statement or representation. RCW 74.09.230.[5] The State must prove actual knowledge, but may rely on circumstantial evidence. State v. Allen, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). The distinction between actual knowledge based on circumstantial evidence and "knowledge because the defendant 'should have known' is critical." Allen, 182 Wn.2d at 374. The jury must find that the defendant actually knew, not that the defendant should have known. Allen, 182 Wn.2d at 374.

To prevail on a claim of prosecutorial misconduct, the defendant must prove that the prosecutor's comments were improper and prejudicial. State v. Yates, 161 Wn.2d 714, 774, 168 P.3d 359 (2007). "Any allegedly improper statements should be viewed within the context of the prosecutor's entire

---

[5] RCW 74.09.230 includes three alternate means of commission:
Any person, including any corporation, that
(1) knowingly makes or causes to be made any false statement or representation of a material fact in any application for any payment under any medical care program authorized under this chapter, or other applicable law, or
(2) at any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to such payment, or knowingly falsifies, conceals, or covers up by any trick, scheme, or device a material fact in connection with such application or payment, or
(3) having knowledge of the occurrence of any event affecting (a) the initial or continued right to any payment, or (b) the initial or continued right to any such payment of any other individual in whose behalf he or she has applied for or is receiving such payment, conceals or fails to disclose such event with an intent fraudulently to secure such payment either in a greater amount or quantity than is due or when no such payment is authorized, shall be guilty of a class C felony.

7

argument, the issues in the case, the evidence discussed in the argument, and the jury instructions." State v. Dhaliwal, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). A prosecutor commits misconduct by misstating the law. Allen, 182 Wn.2d at 373.

After finding that a prosecutor's comments are improper, the appellate court must examine whether the defendant was prejudiced. Allen, 182 Wn.2d at 375. Where, as here, the defendant objects, "the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict."[6] State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).

The trial court provided the definition of knowledge in a jury instruction. The instruction included the statement, "If a person has information that would lead a reasonable person in the same situation to believe that a fact exists, the jury is permitted but not required to find that he or she acted with knowledge of that fact."[7] In arguing the case to the jury, the prosecutor reiterated this definition and ultimately summarized the knowledge requirement:

> So anybody would have known because any reasonable person would have known, right? Obviously you can have a situation where maybe a person is a child or maybe a person is suffering from a delusion of some sort or something of that nature, but if a reasonable person should have known a fact, it is fair to assume that the Defendant knew, and therefore, they knew what we have to talk

---

[6] Bowden objected twice during the prosecutor's summary of the definition of knowledge. Both objections were overruled.

[7] Clerk's Papers (CP) at 151. The jury instruction begins, "A person knows or acts knowingly or with knowledge with respect to a fact, circumstance, or result when he or she is aware of that fact, circumstance, or result. It is not necessary that the person know that the fact, circumstance, or result is defined by law as being unlawful or an element of a crime." The final paragraph of the instruction reads, "When acting knowingly as to a particular fact is required to establish an element of a crime, the element is also established if a person acts intentionally as to that fact." CP at 151.

about.[8]

Bowden contends that this statement improperly invited the jury to find that she had knowledge based on what she should have known, not on circumstantial evidence of her actual knowledge.

While not well articulated, the prosecutor's summary of the law did not relieve the State of the burden to prove actual knowledge. The prosecutor emphasized the ability to use circumstantial evidence as demonstrated by what a reasonable person would have known, then properly pointed the jury toward consideration of Bowden's actual knowledge. The prosecutor stated, "So the only conclusion you can come to after hearing all of this evidence is the Defendant knew very well what she was doing."[9] In keeping with the burden of proving actual knowledge, the prosecutor emphasized that Bowden knew that she was submitting false invoices, not that she should have known.

The prosecutor also focused on the jury's ability to infer knowledge from intentionality. "[T]he knowledge really goes to, you know, you are really talking about whether or not, you know, it is not an accident but they did it intentionally. That's what the third paragraph is talking about is the elements established if a person acts intentionally as to that fact."[10] The prosecutor then drew a comparison to Bowden's actions. "[W]hen she represents, I know, I worked 113 hours and he's paying me, that's intentional. She knows she is going to get a paycheck when she does that, and she is familiar with the system and she understands it, so these

---

[8] RP (Oct. 19, 2016) at 381.
[9] RP (Oct. 19, 2016) at 389.
[10] RP (Oct. 19, 2016) at 381.

9

things are intentional."[11] This example of intentionality also points toward the requirement of actual knowledge, emphasizing what Bowden knew, not what she should have known.

While the prosecutor's restatement of the jury instruction that defined knowledge borders on a misstatement of the law, it falls short of the multiple, intentional misstatements of the law that amounted to flagrant misconduct in Allen. 182 Wn.2d at 374-78. In Allen, the prosecutor repeatedly described the knowledge requirements solely as "should have known," even going so far as to say "'under the law, even if he doesn't actually know, if a reasonable person would have known, he's guilty.'" 182 Wn.2d at 374-75 (emphasis omitted). The prosecutor's repetition of this incorrect standard had a cumulative effect that likely impacted the jury's verdict. Allen, 182 Wn.2d at 376. Additionally, the record showed that the jury submitted a question related to the knowledge requirement during deliberations. Allen, 182 Wn.2d at 378. This was clear evidence that the jury was influenced by the prosecutor's misstatements. Allen, 182 Wn.2d at 378.

In this case, the prosecutor's emphasis on the evidence of Bowden's actual knowledge throughout closing argument counterbalanced the statement that she "should have known." Furthermore, the prosecutor correctly discussed Bowden's intent as circumstantial evidence of knowledge and drew connections to Bowden's actions. The prosecutor adhered to the State's burden of proving actual knowledge. The record contains no evidence of juror confusion. Rather, the jury is presumed to follow its instructions, which included the jury instruction outlining

---

[11] RP (Oct. 19, 2016) at 381.

10

the knowledge requirement. See State v. Lough, 125 Wn.2d 847, 864, 889 P.2d 487 (1995).

After examining the prosecutor's statements in context, there is little likelihood that the poorly phrased restatement of the knowledge requirement impacted the jury's verdict. Therefore, we conclude that there was no prejudice and reversal is not warranted.

## Double Jeopardy

Bowden contends that her multiple convictions for Medicaid false statement violate the constitutional protections against double jeopardy. Because each of Bowden's convictions was based on a distinct act of false reporting, we conclude that the four convictions do not give rise to double jeopardy concerns.

Article I, section 9 of the Washington State Constitution and the Fifth Amendment to the United States Constitution protect a criminal defendant from double jeopardy. State v. Fuller, 185 Wn.2d 30, 33, 367 P.3d 1057 (2016). This includes protection from multiple punishments for the same offense. Fuller, 185 Wn.2d at 33-34. But the legislature may constitutionally authorize multiple punishments for a single course of conduct. State v. Thompson, 192 Wn. App. 733, 737, 370 P.3d 586, review denied, 185 Wn.2d 1041, 377 P.3d 766 (2016).

"Washington courts use a three-step analysis to determine whether the legislature authorized multiple punishments for one course of conduct." Thompson, 192 Wn. App. at 737. "In undertaking this analysis, the court looks first to the plain language of the statute and, if necessary, to the legislative history." State v. Durrett, 150 Wn. App. 402, 406, 208 P.3d 1174 (2009). This requires the

11

court to examine what act or course of conduct is proscribed by the legislature. State v. Sutherby, 165 Wn.2d 870, 879, 204 P.3d 916 (2009). Where the statutory language fails to provide guidance, the court employs the "same evidence" test, "which asks if the crimes are the same in law and fact: in other words, whether, as charged, each offense includes elements not included in the other and whether proof of one offense would also prove the other." Thompson, 192 Wn. App. at 737. Finally, the court may look to the merger doctrine to help determine legislative intent, where "the degree of one offense is elevated by conduct constituting a separate offense." Thompson, 192 Wn. App. at 737-38.

An appellate court reviews double jeopardy claims de novo. Fuller, 185 Wn.2d at 34. If the statute does not clearly identify the unit of prosecution, then the appellate court resolves any ambiguity in favor of the defendant under the rule of lenity. Sutherby, 165 Wn.2d at 878-79.

The Medicaid false statement statute proscribes the act of making or causing to be made "any false statement or representation" related to payment for publicly assisted medical care. RCW 74.09.230(1). Based on the language of the statute, the act of making the false statement is the criminal conduct. Thus, each act of making a false statement is an individual commission of the crime.

Bowden contends that the use of the word "any" in the Medicaid false statement statute requires that a series of fraudulent claims be treated as a single unit of prosecution.[12] Generally, "Washington law favors construing 'any' as meaning 'every' and 'all' rather than . . . 'any one.'" Durrett, 150 Wn. App. at 408.

---

[12] Appellant's Opening Br. at 26.

This construction is applicable to cumulative, ongoing, or course of conduct crimes rather than crimes based on a discrete, defined act. See State v. Adel, 136 Wn.2d 629, 637, 965 P.2d 1072 (1998) (unit of prosecution for misdemeanor marijuana possession was possessing 40 grams of marijuana or less, regardless of the number of locations the drug was kept); Sutherby, 165 Wn.2d at 882 (where statute for possession of child pornography prohibits possession of sexually explicit visual material defined as "'any photograph or other material that contains a reproduction of a photograph,'" the unit of prosecution is one count per possession without regard to number of images (quoting former RCW 9.68A.011 (2002))); Durrett, 150 Wn. App. at 409 (a sex offender's duty to report weekly to the sheriff was appropriately described as an ongoing course of conduct and could not be divided into separate time periods for separate charges); but see State v. Tili, 139 Wn.2d 107, 119, 985 P.2d 365 (1999) (under rape statute defining sexual intercourse as "'any penetration of the vagina or anus,'" each penetration was an independent violation (quoting RCW 9A.44.010(1)(b)).

In this case, the proscribed conduct under RCW 74.09.230 is the discrete action of making a false statement. The unit of prosecution stems from that action. Therefore, the crime of Medicaid false statement is not an ongoing course of conduct, but an individual incident that begins and ends with the submission of a fraudulent invoice.

The jury convicted Bowden of four individual counts of Medicaid false statement based on her submission of telephonic invoices in December 2014, January 2015, February 2015, and March 2015. Each submission of a fraudulent

invoice was an act of making a false statement and, therefore, a separate count. This is consistent with the existing case law. State v. Wright, 183 Wn. App. 719, 728-29, 334 P.3d 22 (2014) (sufficient evidence to support ten counts of Medicaid false statement based on ten fraudulent telephonic invoices); Thompson, 192 Wn. App. at 736 (two telephonic invoices supported two separate counts of Medicaid false statement). Thus, we conclude that there is no violation of Bowden's constitutional protection against double jeopardy.

Affirmed.

_Trickey, J_

WE CONCUR:

_Appelwick, C.J._          _Becker, J._

14